Milton Alpert, J.
This is a claim for the appropriation of claimant’s land pursuant to sections 30 and 349-e of the Highway Law, which proceeding is described as City of Albany, Sheridan Valley Arterial Highway, Albany County, Map No. 9, Parcel No. 9, and Map No. 18, Parcel No. 18.
The aforesaid maps and descriptions were filed in the office of the County Clerk of Albany County on June 30, 1970 and personal service was made on the claimant on May 18, 1971.
The-claim was filed with the Clerk of the Court of Claims and the Attorney-General on August 30, 1972, and has not been assigned or submitted to any other court or tribunal for audit or determination.
The court adopts the descriptions .of1 the appropriated property as shown on the maps and descriptions filed in the Albany County Clerk’s office, copies of which are attached to the claim ánd same are incorporated herein by reference.
*941 The claim alleges that the State of New York, for highway purposes, appropriated two parcels of land located in the City of Albany in an area commonly referred to as Clinton Square. One of the parcels, Map No. 18, Parcel No. 18, was an oval-shaped parcel about 200± feet in length and about 45 or 50± feet in width, bounded on all sides by roadways, and was commonly referred to as Clinton Square Plaza (hereafter referred to as the Plaza). By order of this court, entered March 8,1973, the portion of the claim as it pertains to Clinton Square Plaza was severed, and a separate trial was had with respect to the legal issue of compensability as it applied to Map. No. 18, Parcel No. 18. This decision, therefore, is solely concerned with the .issue of compensability of such taking of Clinton Square Plaza under section 3 of1 the General Municipal Law.
Section 3 of the General Municipal Law reads as follows:
1 ‘ Where property of a municipal corporation, school district or district corporation is taken in the exercise of the power of eminent domain for a purpose substantially different from that for which it is held by such municipal corporation, school district or district corporation, just compensation to the municipal corporation, school district or district corporation shall be made in the same manner, to the same extent and subject to the same limitations as though it were private property.”
The issue involved here, simply stated, is whether or not the appropriation by the State of New York was for a substantially different purpose from that for which the City of Albany held the Plaza prior to the appropriation.
There is no question as to the purpose for which the State of New York took the property. It was for highway purposes. The basic question here, therefore, is for what purpose the city held title to the Plaza prior to the taking. Then compensability under section 3 of the General Municipal Law may be determined (cf. City of Albany v. State of New York, 71 Misc 2d 294, 299).
Title to the parcel involved was vested in the City of Albany by the Dongan Charter dated July 22, 1686.
The State of New York took the position on the trial that, at the time of the taking, and for a long time prior thereto the Plaza was used for highway purposes. In support of this position, it presented evidence that for years the Plaza was used by members of the general public while they waited for buses which parked along the Plaza prior to their departure along North Pearl Street, a main thoroughfare which abutted the Plaza. The State also presented evidence of pedestrian use of the Plaza ' and drew the conclusion that the use was substantially the same *942 before and after the taking, with only the area of the Plaza reduced, as the highway was relocated along North Pearl Street by having the former jog or bend at Clinton Square and North Pearl Street straightened out.
The city, on the other hand, presented in evidence as its • Exhibit No. 3, a certified photocopy of a report to the Common Council of the City of Albany dated July 14, 1834 and of the resolution adopted by the Common Council on the basis of such report. These documents relate to then existing Clinton Square. They are summarized as follows:
1. The committee to whom a petition was referred, praying for the ‘1 improvement of Clinton Square by the enclosure of a part of the same and the erection of an Iron fence,” did “ Respectfully Report.”
2. That in the committee’s opinion “ the improvement contemplated is of a character which will be highly creditable to the City.”
3. That ‘ ‘ there are now no public enclosures in the lower part of the City. All our public walks and parks are on the hill which is at times difficult or unpleasant of access.”
4. That the City Surveyor had made a sketch ‘ ‘ of the enclosure ” which was submitted with the report. Such sketch proposed ‘ ‘ leaving the street on the west side of the square forty four feet in width and on the East side will be the most used for carriages and by persons passing; it is proper that its width should exceed that of the street on the west side. This will leave the enclosure about fifty eight feet in width, at the centre and the walk surrounding the same of eight feet in width constituting a part of the street on each side. ’ ’
5. That the petitioners had paid heavy assessments for opening the Square and that ‘1 its original purpose and end will never be fulfilled unless an enclosure is made. It was contemplated by this body at the time the improvement was ordered and the place was by a law of this Board denominated Clinton Square.” The petitioners desired ‘ ‘ an improvement which will be ornamental and useful to the City.”
6. The committee recommended adoption of “ a Resolution or law if necessary authorizing the enclosure of a part of Clinton Square for the purposes and in the manner asked for by the prayer of the petitioners. The Map and plan of the City Surveyor with his accompanying statement gives the size and character of the Iron railing proposed to be erected which is similar to that of Academy park.”
*943 7. The committee recommended adoption of a resolution “ That an enclosure he made in Clinton Square * * * leaving a Street on the East side of said enclosure of at least 52 feet in width and on the West side of at least —[*] feet in width the said enclosure to he surrounded by a substantial Iron railing of suitable size and character resting on a permanent stone foundation.”
8. That the board “ do appropriate ” $1,500 toward the expense of “ constructing and putting up said Iron railing ” but that it should not be paid out until proof was submitted that $3,000 “ has been faithfully and necessarily applied for the construction of said Park fence.”
9. That the committee report ‘ ‘ was accepted ’ ’ and the resolution “ unanimously adopted.”
The report and resolution clearly provided for an enclosure in Clinton Square, that there should be streets on the east and west for carriage and pedestrian traffic, and that there would be surrounding walks which would constitute part of the street on each side. Also, the word ‘ ‘ park ’ ’ appeared therein three times in the following respects:
1. That there were no public enclosures in the lower part of the city and that all its public walks and parks were on the hill. (Here the concept of public enclosure is related to a public park.)
2. That the iron railing proposed to be erected was similar to that of the Academy Park.
3. That appropriated money was to be applied for the construction of “ said Park fence.” (Here the concept is that the fence was for a park.)
On the basis of the concepts that a square was involved, that there would be an enclosure (which is not consistent with a street use concept), that there would be streets on the east and west, and that the surrounding walk would constitute part of the street on each side, and on the basis of the above three references to the term 1 ‘ park ’ ’, particularly the last which clearly indicates that the fence would be for a “ park,” the court finds that the above-described resolution of the Common Council had the legal effect of dedicating the area to be enclosed as a park. For such an enclosed area to be legally considered as a park is consistent with an early concept that a park may be an enclosed area and that it may be a relatively small area such as Clinton Square Plaza was (Kupelian v. Andrews, 233 N. Y. 278, 281; Sebring v. Quackenbush, 120 Misc. 609, affd. 214 App. Div. 758; International Garden Club v. Hennessy, 104 Misc. 141,146). The court *944 adds that photographs taken on April 15,1968 and introduced as State’s Exhibit A in evidence show benches which are consistent with park use of Clinton Square Plaza as of such recent date.
Having found such dedication as a park, the law is clear that, once municipal land is dedicated to the purpose of a park, only an act of the Legislature may change or authorize a change in such purpose (Aldrich v. City of New York, 208 Misc. 930, affd. 2 A D 2d 760; 1955 Opns. Atty. Gen. 268 relating to the same question; Sebring v. Quackenbush, 120 Misc. 609, affd. 214 App. Div. 758, supra). No such act of the Legislature has been called to'the court’s attention.
Since Clinton Square Plaza was in legal effect a park at the time of the instant taking by the State and since the State’s taking was for highway purposes, the court finds that such taking was for a substantially different purpose and that it is compensable under section 3 of the General Municipal Law (City of Albany v. State of New York, 71 Misc 2d 294, 299, supra).
Accordingly, the parties are directed to prepare and file appraisals which shall be exchanged as required by rule 25a of this court (22 NYCRR 1200.27). Thereafter, the Clerk of the court is directed to set the claim down for trial on the question of damages to be awarded.

 The copy is 'blank — it is clear that 44 feet would he the correct figure.